GEOFFREY WHITE, Esq.
Nevada Bar No. 0892
WHITE & WETHERALL, LLP
3185 Lakeside Drive
Reno, Nevada 89509
Telephone: (775) 828-9999
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| RANDOLPH K. JORDAN and KIMBERLY J. JORDAN, on Behalf of Themselves and a Class of Persons Similarly Situated, | Case No.: 3:09-cv-00585 |
| Plaintiffs, | CLASS ACTION |
| vs. | COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATION OF ERISA DISCLOSURE REQUIREMENTS |
| INTERNATIONAL GAME TECHNOLOGY; IGT PROFIT SHARING PLAN COMMITTEE; DAVID D. JOHNSON; JOHN DOES 1-10, ROBERT A. BITTMAN; RICHARD R. BURT; PATTI S. HART; LESLIE S. HEISZ; ROBERT A. MATHEWSON; THOMAS J. MATTHEWS; ROBERT MILLER; FREDERICK B. RENTSCHLER; DAVID E. ROBERSON; PHILIP G. SATRE | JURY TRIAL DEMANDED |
| Defendants. | |

## **COMPLAINT**

Plaintiffs Randolph K. Jordan & Kimberly J. Jordan ("Plaintiffs"), on behalf of themselves and on behalf of a class consisting of similarly situated participants and beneficiaries (the "Participants") of the IGT Profit Sharing Plan (the "Plan"), by their attorneys, allege the following for their Complaint (the "Complaint"). The allegations contained herein are based on the investigation of counsel, except for those allegations pertaining to the Plaintiffs, which are based upon personal knowledge. Plaintiffs may, after discovery and/or disclosure proceedings in this case, seek leave to amend this Complaint to add new parties or claims.

//

1

## NATURE OF ACTION

1.      Plaintiffs, who were Participants in the Plan, bring this civil enforcement action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for plan-wide relief on behalf of a class consisting of all current and former Participants in the Plan for whose individual accounts the Plan held shares of common stock of International Game Technology (hereinafter "IGT" or the "Company") at any time from November 1, 2007 through and including March 9, 2009 (the period from November 1, 2007 through and including March 9, 2009 being hereinafter referred to as the "Class Period"). Plaintiffs bring this action on behalf of the Plan and the Class pursuant to § 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1132(a)(2) and (3). As more fully set forth below, Defendants breached their fiduciary duties to the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, including 29 C.F.R. § 2550. Defendants breached their fiduciary duties to the Participants in various ways, including, but not limited to, (i) misrepresenting and failing to disclose material facts to the Participants in connection with the administration of the Plan; (ii) failing to exercise their fiduciary duties to the Participants solely in the interests of the Participants for the exclusive purpose of providing benefits to Participants and their beneficiaries; (iii) failing to manage the Plan's assets with the care, skill, prudence or diligence of a prudent person under the circumstances; (iv) imprudently failing to diversify the investments in the Plan so as to minimize the risk of large losses; and (v) permitting the Participants to continue to elect to invest their retirement monies in IGT common stock when the market price of IGT common stock was artificially inflated, when it was imprudent to do so, and when the Participants were not provided with timely, accurate and complete information concerning the Company as required by applicable law. As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are personally liable to make good to the Plan the losses resulting from each such breach of fiduciary duty. In addition, under § 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3)), Plaintiffs seek other forms of appropriate equitable relief, including, without limitation, injunctive relief and, as available under applicable law, imposition of a constructive trust, restitution, and other monetary relief. Insofar as any

1   Defendant is sued alternatively as a knowing participant in a breach of fiduciary duty for

2   equitable relief, Plaintiffs intend to proceed pursuant to § 502(a)(3) of ERISA, 29 U.S.C. §

3   1132(a)(3).

### JURISDICTION AND VENUE

5       2.       Plaintiffs' claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

6       3.       This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29

7   U.S.C. § 1132(e)(1).

8       4.       Venue is proper in this District pursuant to ERISA § 502(e)(2), 29

9   U.S.C. § 1132(e)(2), because this is a District where the Plan was administered, where breaches

10   of fiduciary duty took place and/or where one or more Defendants reside or may be found.

### THE PARTIES

12       5.       Plaintiff Randolph K. Jordan is a resident of the State of Florida. Plaintiff was a

13   Participant in the Plan at times relevant to the Complaint and maintained an investment in IGT

14   common stock in his individual account in the one of the Plan during the Class Period.

15       6.       Plaintiff Kimberly J. Jordan is a resident of the State of Florida. Plaintiff was a

16   Participant in the Plan at times relevant to the Complaint and maintained an investment in IGT

17   common stock in her individual account in the one of the Plan during the Class Period.

18       7.       Defendant IGT is a global gaming company specializing in the design,

19   manufacture, and marketing of electronic gaming equipment and network systems, as well as

20   licensing and services. The Company maintains an array of entertainment-inspired gaming

21   product lines. In addition to its United States production facilities in Nevada, it manufactures

22   gaming products in the United Kingdom and through a third-party manufacturer in Japan. The

23   Company derives its revenues from the distribution of electronic gaming equipment and network

24   systems, as well as licensing and services. Gaming operations generate recurring revenues by

25   providing customers with its proprietary gaming equipment and network systems, as well as

26   licensing, services, and component parts. Its product sales include the sale of gaming equipment

27   and network systems, as well as licensing, services, and component parts. The Company is

28

1   incorporated in Nevada and maintains its principal place of business at 9295 Prototype Drive,

2   Reno, NV 89521.

3          8.      At all times relevant to this Complaint, Defendant IGT Profit Sharing Plan

4   Committee (the "Committee") managed and administered the Plan and the assets of the Plan and

5   acted as a fiduciary with respect to the Plan.  The Plan's Form 11-K Annual Report for the fiscal

6   year ended December 31, 2008, which was filed with the SEC on or about June 26, 2009 (the

7   "2009 11-K") states that "[t]he profit sharing committee has selected 27 investment options that

8   have a variety of growth and risk characteristics."  On information and belief, the Committee

9   consisted of the Company's Board of Directors, or persons who the Board appointed.

10         9.      At times relevant to this Complaint, Defendant David D. Johnson ("Johnson")

11   was a member and/or the Chairman of the Committee. Defendant Johnson signed the 2009 11-k

12   in his capacity as Chairman of the Committee.  Defendant Johnson has been IGT's Executive

13   Vice President, General Counsel and Secretary since 2005.  He is responsible for the direction of

14   the legal, intellectual property, compliance, government relations, corporate audit, risk

15   management and human resource functions.  Defendant Johnson was a fiduciary of the Plan

16   during the Class period.

17         10.     John Does 1-10 were the individual members of the Committee and members of

18   any other committee(s) which administered the Plan.   The identity of the members of the

19   Committee, and of any other committee(s) which was or were responsible for carrying out the

20   provisions of the Plan, is currently not known.  On information and belief, the Doe Defendants

21   were directors and/or officers of the Company and knew or should have known of the

22   Company's problems as described herein.

23         11.     According to, e.g., Exhibit 10-8 of the Company's 2000 10-K the Profit Sharing

24   Plan Committee "[c]onsists of the Board, or such committee as the Board shall appoint. Thus the

25   members of the Company's Board of Directors either served as the Doe Defendants and/or were

26   the individuals who were responsible for appointing Defendant Johnson and the John Doe

27   Defendants who administered the Plan.

28

4

12.     The directors of the Company who served as fiduciaries of the Plan during the Class Period included:

a.     Defendant Robert A. Bittman has served as a director since May 2000 and served as IGT's Executive Vice President, Product Strategy from 2003 until his retirement from IGT in December 2008;

b.     Defendant Richard R. Burt has served as a director since December of 2001;

c.     Defendant Patti S. Hart was appointed IGT's President and Chief Executive Officer in April 2009, and has served on its board of directors since June 2006;

d.     Defendant Leslie S. Heisz, served on IGT's board of directors from June 2003 until some time during the class period;

e.     Defendant Robert A. Mathewson has served as a director since 2003;

f.     Defendant Thomas J. Matthews (Chair) was appointed to the board of directors in December 2001 and was named Chairman in March 2005. Mr. Matthews served as IGT's President and Chief Executive Officer from 2003 to April 2009, and he was IGT's Chief Operating Officer from 2001 to June 2007;

g.     Defendant Robert Miller has served as a director since 2003;

h.     Defendant Frederick B. Rentschler has served as a director since 1992;

i.     Defendant David E. Roberson has served as a director since December of 2008, and;

j.     Defendant Philip G. Satre was appointed to the board on January 28, 2009.

13.     Defendants Bittman, Burt, Hart, Heisz, Matthewson, Matthews, Miller, Rentschler, Roberson and Satre are collectively refered to herein as the "Director Defendants."

14.     The Director Defendants were responsible for appointing and monitoring the Doe Defendants.   The Director Defendants failed to properly appoint, monitor and inform such persons in that the Director Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the Director Defendants did adequately inform such persons of the true financial and operating condition of the Company

(including the financial and operating problems being experienced by IGT during the Class Period identified herein) but nonetheless continued to allow such persons to offer IGT common stock as an investment option under the Plan when the market price of IGT common stock was artificially inflated and when IGT common stock was not a prudent investment for Participants' retirement accounts under the Plan.   Liability is only asserted against each of the Director Defendants for such periods of time as the Director Defendant acted as a fiduciary with respect to the Plan.  The Director Defendants were directors and/or officers of the Company and knew or should have known of the Company's problems as described herein.

## CLASS ACTION ALLEGATIONS

15.   Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a), (b)(1) and/or (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all current and former Participants in the Plan for whose individual accounts the Plan held shares of IGT common stock (including in the form of IGT common stock or units of the IGT Unitized Stock Fund (the "Fund")) at any time from November 1, 2007 through and including March 9, 2009 (the "Class").

16.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at minimum, thousands of members of the Class.  The Form 5500 Annual Return/Report of Employee Benefit Plan for the Plan states that there were 5,429 Plan participants as of December 31, 2007.

17.   Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)    Whether Defendants were fiduciaries;

        (b)    Whether Defendants breached their fiduciary duties;

        (c)    Whether the Plan and the Participants were injured by such breaches; and

        (d)    Whether the Class is entitled to damages and injunctive relief.

18.     Plaintiffs' claims are typical of the claims of the other members of the Class, as Plaintiffs and all members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

19.     Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have retained able counsel with extensive experience in class action ERISA litigation.  The interests of Plaintiffs are coincident with and not antagonistic to the interests of the other class members.

20.     Prosecution of separate actions by members of the class would create a risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

21.     Questions of law and questions of fact which are common to the members of the class will predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this Complaint, taking into account:

        (a)     the interest of members of the class in individually controlling the prosecution or defense of separate actions;

        (b)     the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

        (c)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

        (d)     the difficulties likely to be encountered in the management of a class action.

22.     Moreover, because the damages suffered by many of the Participants will be relatively small, the expense and burden of individually litigating their rights would make it impossible to individually redress the wrongs alleged herein.

23.     The claims herein are under ERISA and related principles of federal common law cannot be asserted by the plaintiffs in derivative actions against the company or in class actions under securities law.

24.     Under and as required by ERISA, Defendants carry insurance for claims asserted herein that may not be available to the defendants in any other actions.

**DESCRIPTION OF THE PLAN**

25.     At all times relevant to this Complaint, the Plan was an employee benefit Plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

26.     At all times relevant to this Complaint, the Plan was a "defined contribution" or "individual account" Plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which were allocated to such Participant's accounts.

27.     At all times relevant to this Complaint, the Plan provided a number of different options for investment of the Plan's assets, including IGT common stock.

28.     At all times relevant to this Complaint, Participants were allowed to direct the Plan to purchase investments from among the investment options available under the Plan and allocate them to their individual accounts.

29.     The 2009 11-K, states, among other things:

1.     **Description of Plan**

The IGT Profit Sharing Plan (Plan) is sponsored by International Game Technology (referred to throughout these notes as IGT, we, our and us) and consists of two programs, the profit sharing program and the 401(k) program. The following description of the Plan is provided for general information purposes only. Participants should refer to the IGT Plan document and summary

8

1   plan description for a more complete description of the Plan's
2   provisions.

3   The Plan is subject to the provisions of the Employee Retirement
4   Income Security Act of 1974 (ERISA), as amended, and other
5   provisions of the Internal Revenue Code (IRC). This defined
6   contribution plan covering all eligible IGT employees was adopted
7   in December 1980 and is administered by Fidelity Investments
8   (Fidelity).

9   ***Profit Sharing Program***

10  IGT may make an annual profit sharing contribution based on
11  operating profits as determined by its Board of Directors. The
12  contribution is allocated to eligible participants' accounts
13  proportionately based on annual eligible compensation.

14  Our employees are eligible to participate in the profit sharing
15  program after completing 1,000 hours of service in a calendar year
16  and reaching the age of 18. Once eligible, Plan participants must
17  be employed on the last day of the Plan year (December 31) to
18  receive their annual profit sharing allocations. Participation in
19  profit sharing is retroactive to January 1 of the year in which the
20  employee became eligible.

21  ***401(k) Program***

22  Participants may contribute up to 40% of their pretax annual
23  compensation, as defined in the Plan. Highly compensated
24  employees were allowed to make elective deferral contributions up
25  to 10% of their annual salary for 2008 and 2007. Employees may
26  make pre-tax contributions to their accounts upon completion of 30
27  days of full time employment, or one year of 1,000 hours of part-
28  time employment. A participant may discontinue contributions to

the Plan at any time. Participants direct 100% of their contributions, matching contributions and profit sharing contributions to the Plan.

IGT's 401(k) contribution matching program provides for the matching of 100% of an employee's contributions up to $750 as determined by the Profit Sharing Committee. Employees are immediately 100% vested in all 401(k) contributions. The Plan also allows for rollover contributions from other qualified retirement plans. If the rollover is from an individual retirement arrangement, all assets in the prior retirement plan must have originated as contributions made under a qualified plan.

* * *

**Investment Options**

The profit sharing committee has selected 27 investment options that have a variety of growth and risk characteristics. Plan participants may allocate all contributions to one investment fund or split them between any combination of funds in increments of 1%. A participant may change how current and/or future contributions are invested at any time during the Plan year. Profit Sharing funds are deposited annually into the Retirement Money Market Portfolio prior to distribution to eligible participants. Once distributed, employer contributions are invested as directed by the participants.

30.     The 2009 11-K also states that $34,228,670 of the Plan's total investments of $271,247,802, or approximately 12.6% of the investments of the Plan, were invested in IGT common stock as of December 31, 2008 and that $104,156,009 of the Plan's total investments of $426,570,900, or approximately 24.4% of the investments of the Plan, were invested in IGT common stock as of December 31, 2007.

31.     During the Class Period the market price of IGT common stock was artificially inflated due to the concealment of IGT's true financial and operating condition as described herein.  Throughout the Class Period, IGT common stock was not a prudent investment for the Participants' individual retirement accounts under the Plan.  If Defendants had made full disclosure to the Participants of IGT's true financial and operating condition, as described herein, the Participants would not have chosen IGT common stock as an investment option under the Plan to the extent that they did.  Indeed, had the truth been disclosed to the Participants, IGT common stock would not have been chosen by many Participants as an investment option at all.

## ADMINISTRATION OF THE PLAN

32.     Defendants, as fiduciaries of the Plan, were required by ERISA to furnish certain information to Participants.  For example, ERISA Section 101 (29 U.S.C. § 1021) requires the Plan's Administrator to furnish Summary Plan Descriptions ("SPD") to Participants.  ERISA Section 102 (29 U.S.C. § 1022) provides that an SPD must apprise Participants of their rights and obligations under a plan.  In addition, every person who held IGT stock in a Plan account received annually a Proxy Statement which purported to describe (including through the incorporation of other company documents) the business and operations of IGT, as well as important information concerning IGT's Directors and senior executives.

33.     At all times relevant to this Complaint, Defendants had the discretion to establish and change the investment alternatives among which Participants could direct the investment of the Plan's assets allocated to their accounts.

34.     At all times relevant to this Complaint, Defendants had a duty to review the Plan's investment policies and the selection and the performance of investment alternatives offered under the Plan.  There was no requirement that any assets of the Plan be invested in Company stock or that Company stock be continued as an investment alternative.

35.     At all times relevant to this Complaint, Defendants had a duty to obtain from the Company information necessary for the proper administration of the Plan.

36.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan as defined by ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary

authority or control respecting management of the Plan or exercised discretionary authority or control respecting management or disposition of assets and had discretionary authority or responsibility in the administration of the Plan.

37.    Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA § 405, 29 U.S.C. § 1105.

## BRACHES OF FIDUCIARY DUTY

38.    As required by ERISA, Defendants issued one or more SPDs, each of which either referred to or incorporated by reference the documents filed by IGT with the SEC under the federal securities laws.    These filings, however, contained numerous material misrepresentations and omitted to state material facts which were necessary to make the statements which were made not misleading.

39.    In particular, IGT was an imprudent retirement investment for the Plan during the Class Period because of, *inter alia*, the facts that:

    a.    The Company's research and development funding materially compromised its growth prospects and caused the Company lost market share to rivals;

    b.    The Company's research and development funding and loss of market share made Company growth statements overly optimistic;

    c.    Increasing costs and economic troubles made the company's time frame for marketing its server-based technology ("SB") and its "advanced video gaming platform ("AVP") impossible;

    d.    The Company minimized the impact of a slowdown in the gaming industry which undermined the Company's shift to SB and AVP;

    e.    The Company failed to reduce expenses to meet a slowdown in the gaming industry;

    f.    as a result of the above, the Company's actual and projected results for the Class Period were grossly inflated;

g.    the Company lacked the required internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts;

h.    By the time that the Company reacted to the above, there was concern that the Company may not be able to do enough to offset a top line slowdown;

i.    The Company faced a material debt refinancing risk; and

j.    the Company lacked the necessary personnel to issue accurate financial reports and projections.

40.    Defendants were not obligated by ERISA or by the Plan to discharge their duty to provide information to Participants through the mechanism of incorporation of SEC filings. Defendants could have fulfilled this duty by setting forth sufficient and accurate information in the SPDs themselves, and updating such information as appropriate.   Defendants chose, however, to adopt the mechanism of incorporation of SEC filings into the SPDs, and the SEC filings contained materially false and misleading information which caused loss to the Plan and the Participants as set forth above.

41.    At all relevant times, Defendants knew or should have known that Company stock was an imprudent retirement investment for the Participants and the Plan.

42.    At all relevant times, Defendants knew or should have known of the material misrepresentations and omissions, including those filed with the SEC and incorporated by reference in the SPDs.

**FACTUAL ALLEGATIONS**

43.    During the Class Period, Defendants either were or should have been aware that IGT's stock was artificially inflated by materially false public statements. As of the close of business on the first day of the Class Period, November 1, 2007, IGT's common stock was trading at $42.75 per share.

44.    On November 1, 2007, the Company issued a press release entitled "International Game Technology Reports Fourth Quarter and Fiscal Year 2007 Results" in which the Company stated in relevant part:

International Game Technology (NYSE: IGT) announced today operating results for the fourth quarter and fiscal year ended September 30, 2007.

Net income for the fiscal year increased to $508.2 million or $1.51 per diluted share compared to $473.6 million or $1.34 per diluted share in the prior year. Fourth quarter net income totaled $122.6 million or $0.38 per diluted share versus $114.9 million or $0.33 per diluted share in the same quarter last year.

Fiscal year financial highlights:

- Record total revenues of $2.6 billion, up 4%, and related gross profit up 8% from the prior year
- Record gaming operations installed base of 59,200 machines at the end of the fourth quarter, up 19% over prior year end
- Record gaming operations revenues of $1.4 billion, up 9%, and related gross profit up 13% from the prior year
- Record non-machine sales of $384.2 million, up 6% from the prior year
- Record Adjusted EBITDA totaling $1.1 billion, up 10% from the prior year
- Record diluted earnings per share of $1.51, up 13% from the prior year

"IGT achieved another record year in 2007, led by record revenue and placements of our gaming operations machines. Non-machine sales also reached record levels as *our business model continues to evolve towards a greater focus on software and systems*," said Chairman and CEO TJ Matthews. "Adjusted EBITDA reached $1.1 billion, and we generated a record level of cash flow from

operations. All of these accomplishments, coupled with the strength of our balance sheet, allowed IGT to return $1.3 billion to shareholders in the form of stock repurchases and dividends in fiscal 2007."

(emphasis added).

45.     After the earnings press release, on an analyst earnings conference call, Patrick Cavanaugh, Vice President, Corporate Finance and Investor Relations of International Game Technology, opened the call by stating in part that the Company generated over 70% of its revenues, operating income, and cash without shipping a single unit and Company Chairman and Defendant Matthews reiterated that game operations and non-machine product sales contributed nearly 70% of the Company's 2007 revenue. Defendant Matthews continued to state "we expect that we'll have continued growth from these higher-margin sources in 2008 and beyond. These reflect our efforts to emphasize our software and service businesses.... Looking forward, the install base of game machines is expected to enter a new growth phase...."

46.     Defendant Matthews also stated on the same call that the Company's was "especially excited" about returns from research and development efforts over the next few years as server-based technology ("SB") and its "advanced video gaming platform ("AVP") are rolled out, and which were on target for release in 2009.

47.     Defendant Matthews further stated on the November 1, 2007 call that IGT was the "clear technology leader" of the industry and reaffirmed EPS guidance for the next two quarters in the range of $0.35 to $0.40, adding "we believe there is a good likelihood that our EPS will break out of this range in the second half of '08."

48.     In response to the positive news of November 1, 2007, the Company's stock steadily rose for the next three trading days, closing at $43.66 on November 2nd; $44.36 on November 5th, and; $45.05 on November 6th.

49.     On November 28, 2007, the Company filed its 2007 Annual Report on Form 10-K for the fiscal year ended September 30, 2007. The MD&A section of the 10-K stated in relevant parts that:

We are able to return value to our shareholders and reinvest in our business because of our ability to generate substantial operating cash flows, the highest ever in fiscal 2007 at $821.5 million. During fiscal 2007 we returned $1.3 billion to our shareholders through dividends and share repurchases. We consider strategic business combinations, investments, and alliances to expand our geographic reach, product lines and customer base.

* * *

*In fiscal 2007 we achieved the highest annual revenues in company history at $2.6 billion,* largely attributable to growth in our gaming operations installed base reaching a record 59,200 machines in service at September 30, 2007. We operate in two segments, North America and International, with certain unallocated company-wide income and expenses managed at the corporate level. International operations continue to be a growing contributor with operating income up 44% in fiscal 2007. See the BUSINESS SEGMENT RESULTS below and Note 18 of our Consolidated Financial Statements for additional segment information and financial results.

We are dedicated to generating financial growth by continuing to focus on the three cornerstones of our success: product development, market development and capital deployment. We invest more in product development than any of our principal competitors and believe this helps us deliver the broadest gaming product lines across the most markets. Our current development efforts reflect our forward thinking and will support the near term evolution of the gaming floor. This includes the expansion of our business model beyond machine sales toward a more systems-

centric, networked gaming environment. Our new World Game Platform initiative, started in fiscal 2007, will unify and standardize our development efforts worldwide. *We believe our sb™ applications will be commercially available beginning in 2009 and will further differentiate IGT gaming products by offering operators new ways to engage and interact with players, as well as the ability to market cross-functional products and player conveniences.*

\* \* \*

*We are able to return value to our shareholders and reinvest in our business because of our ability to generate substantial operating cash flows, the highest ever in fiscal 2007 at $821.5 million.* During fiscal 2007 we returned $1.3 billion to our shareholders through dividends and share repurchases. We consider strategic business combinations, investments, and alliances to expand our geographic reach, product lines and customer base. During fiscal 2007, we invested $105.6 million in China LotSynergy Holdings, Ltd. (CLS) for developing opportunities in the China lottery, $31.2 million in electronic table games with Digideal and $21.9 million in VCAT for the Mariposa CRM software. See Notes 2 and 5 of our Consolidated Financial Statements for additional information about these investments.

While domestic replacement sales are expected to remain at historically low levels in the upcoming year, we anticipate benefiting from growth in new or expanding domestic markets beginning in the second half of fiscal 2008. We also anticipate revenues will be driven by our growing gaming operations installed base, network systems sales, and machine sales as casino

operators begin to upgrade platforms to capitalize on networked functionality and new features. We also expect to benefit from further gaming expansion outside of North America and new content distribution channels enabled by network systems and table gaming initiatives. We will continue server-based gaming development, working with our competitors and customers to ensure the future is powered by an open network that enables products from multiple suppliers to work together without the need for additional programming or interfaces. [emphasis added]

50.     In response to the positive news of November 28, 2007, the Company's stock steadily rose for the next two trading days, closing at $42.89 on November 28th (an increase of 3.2%) and closing at $43.65 on November 29th (an increase of an additional 1.77%).

51.     On January 17, 2008, IGT issued a press release entitled "International Game Technology Reports First Quarter Fiscal Year 2008 Results" announcing its results for the quarter ended December 31, 2007, which stated in relevant part that:

Consolidated revenues and gross profit for the quarter were $645.8 million and $366.5 million, respectively, compared to $642.3 million and $352.0 million in the prior year quarter. Consolidated gross margins for the first quarter came in at 57%, up from 55% in the prior year quarter. Net income in the first quarter totaled $113.7 million or $0.36 per diluted share, compared to $121.0 million and $0.35 per diluted share in the prior year quarter.

"During the first quarter, IGT made progress towards achieving our long-term objectives, including demonstrating at the Global Gaming Expo this past November our vision for the right slot floor today and in the future. *Operationally we continued to generate margin improvements and moderate revenue growth despite*

*reduced marketplace demand,"* said Chairman and CEO TJ Matthews.

\* \* \*

**Cash Flows & Balance Sheet**

IGT generated $120.2 million in operating cash flow on net income of $113.7 million in the first quarter, down from $223.5 million and $121.0 million, respectively, in the prior year quarter. Operating cash flow decreased primarily due to additional prepayments to secure long-term licensing rights and timing of payments in working capital. First quarter capital expenditures totaled $62.7 million compared to $103.8 million in the prior year quarter. [emphasis added]

52.     Company executives Cavanaugh, Defendant Matthews and Siciliano again conducted an earnings conference call in which they affirmed the Company's results and that SB continued to make good progress and that "IGT will be moving to a more service-software revenue orientation that has an expanded margin associated with [it] and really less reliance on product sales at some point in the future." On the call, Defendant Matthews also affirmed the Company's EPS guidance range of $0.35 to $0.40 and predicted that EPS would likely exceed $0.40/share "because of reasonably good visibility [to new and expanded units.]"

53.     In response, the Company's stock price fell over 4% on the next two days, to close at $38.09/share on January 18, 2008.

54.     On April 17, 2008, IGT issued a press release entitled "CityCenter and IGT Sign Agreement for Server-Based Casino at Development's New Resort Casino" announcing that "CityCenter and International Game Technology (NYSE: IGT) have signed a formal memorandum of understanding pertaining to installing a server-based network and related IGT sb™ and gaming management system products at the development's resort casino scheduled to open in late 2009." The same day, IGT issued a press release entitled "International Game Technology Reports Second Quarter Fiscal Year 2008 Results" which included the following:

1   International Game Technology (NYSE: IGT) announced today
2   operating results for the second quarter ended March 31, 2008. Net
3   income for the quarter was $68.4 million or $0.22 per diluted share
4   versus $128.2 million or $0.38 per diluted share in the same
5   quarter last year. For the six-month period ended March 31, 2008,
6   net income was $182.1 million or $0.57 per diluted share
7   compared to $249.2 million or $0.73 per diluted share in the same
8   period last year.

9   The second quarter of the current year was unfavorably impacted
10  by a number of significant items including a steep decline in
11  interest rates, technological obsolescence charges related to the
12  transition toward our new cabinets and platforms, additional bad
13  debt provisions and discrete tax items. Collectively, these items
14  totaled $20.4 million after tax or $0.06 per diluted share. On a
15  comparative basis, the second quarter of the prior year was
16  favorably impacted by gains from Gulf Coast hurricane property
17  damage and business interruption insurance proceeds and the sale
18  of a corporate aircraft, as well as favorable bad debt provisions
19  collectively totaling $17.1 million after tax or $0.05 per diluted
20  share. A supplemental schedule of these items is included at the
21  end of this release.

22  "IGT's second quarter results were challenged by the current
23  market environment," said Chairman and CEO TJ Matthews. "We
24  remain focused on strategic initiatives which will maintain our
25  standing as the leading worldwide provider of innovative gaming
26  products and services. We continue to prepare for the introduction
27  of the next generation of technological innovations and look
28  forward to the market-driven expansion in domestic and

international jurisdictions we believe will develop in the near future. Recent strategic accomplishments that will enhance IGT's long-term opportunities include our sb™-related agreements with Harrah's and CityCenter, our cross-licensing agreement with WMS, our strategic alliances with Progressive Gaming, Games Media and The Global Draw, and our potential acquisition of Cyberview Technology, Inc."

55.     Company executives Cavanaugh, Defendant Matthews and Siciliano again conducted an earnings conference call in which they affirmed the Company's results and emphasized that replacement demand was anticipated to begin picking up for AVP and SB in the second half of 2008. On the call, Defendant Matthews recognized the Company was having trouble replacing machines with its SB and AVP platforms, but reiterated the timeline for the successful rollouts. Defendant Matthews stated:

We had new products that began shipping in the third quarter and our anticipated new cabinets have delayed some of our customer orders with them expecting to take part in our latest offering. Of course we continue to concentrate on introducing new game themes particularly for the AVP, that is a real core strength here at IGT. We made several deals during the quarter which move us further along the path of successful deployment of server-based gaming.

This morning we announced the deal for CityCenter. We also previously announced the orders that we have for NexGen with Harrah's, the strategic partnership established with WMS and that with BGIC as well. We also announced this morning through our Barcrest subsidiary a partnership with the global draw and games media in the U.K. and then we have the pending potential transaction of Cyberview. All of these should help us with our SB

1   efforts as we continue to make progress on the timelines that we

2   previously announced.

3   To remind people of those timelines '07 was really the introduction

4   of the concept to the marketplace, regulatory agencies and

5   customers. '08 really has been the effort to prove the concept to

6   ourselves technologically, to the marketplace in terms of impact on

7   the customer. We expect to have a field trial of SB 3.0 later this

8   quarter and continue to feel comfortable that our timelines for

9   having meaningful impact on '09 in terms of being able to prove

10   the concept and starting to get floor share for it will impact 2010

11   and beyond as previously articulated.

12   Our efforts continue to focus on driving this technological

13   innovation forward and we want to provide the best content and

14   applications available for gaming floor and for casino operations.

15   On our capital deployment and strategy aspects of our business, we

16   continue to invest in our business, first, with capital expenditures.

17   That's still where we'd rather deploy our money is in continuing to

18   expand our game operations and devising new technology.

19   With that, we were going to consistently use our cash flow as

20   opportunistic use of the balance sheet as demonstrated previously

21   with our stock repurchases and continuing to pursue that activity

22   prospectively. Our liquidity in the midst of this credit crunch

23   remains solid. We have $1.7 billion available to us on our line of

24   credit and our current borrowing rate at LIBOR plus three-eighths

25   is approximately 3%

26   All of these opportunities, as well as others being considered, will

27   allow us to assist our customers who face tight credit conditions,

28   will allow us to pursue partnerships that will acquire access to

1        market and/or technology, and at this time valuations of our peer

2        companies for purposes of considering partnerships and more are

3        more attractive than they have been in recent periods.

4        Market expansion continues really in a very robust way even

5        though there has been a couple of setbacks. For instance, in the

6        back half of '08 we are going to have new shipments to the two

7        racetracks in Indiana and we have the systems deals for both of

8        those racetracks. We expect here in Las Vegas, the Eastside

9        Cannery to open up. There's going to be tribal expansions that are

10      going to take place in Oklahoma and Connecticut.

11                                     * * *

12      In the way of guidance, *we continue to expect an uptick* in our

13      business levels during the second half of the year as new and

14      expansion opportunities open and we release our new cabinets and

15      game titles. However, *given current operating conditions we*

16      *maintain our guidance at $0.35 to $0.40 for the next four quarters*

17      *with the possibility of coming in at the high end, if not slightly*

18      *exceeding this range in the second half of this year.* [emphasis

19      added]

20         56.    Defendant Matthews again reiterated later in the same call that "there is still an

21  opportunity for us to exceed the range in one or both of the quarters in the back half of '08. Just

22  because we do have such good visibility to machine demand."

23         57.    Similarly, in the question and answer session, Defendant Matthews was asked

24  ". . . Your stock is down 11% on the back of lots of weakness in the last several weeks, or what

25  have you. Does that make any sense to you based on what you know about the outlook? I

26  understand the quarter was weak but just wanted to get your view on that?" and responded:

27      I think there was some headline risk to today's press release in that

28      people are going -- people who aren't necessarily trying to be long-

term investors might make decisions based on the first couple of sentences in the press release.

I think that folks that have made long-term commitments are obviously following the progress that we are making on delivering SB and being able to stimulate replacement, being able to follow the ongoing growth of our game ops install base and the reliability of that business and although play level is somewhat affected by economic factors this last quarter, the fact is still an upward trend is alive and well there.

Nonbox sales demonstrate diversity away from this core need to ship boxes. I think all of the things that have made us an interesting Company for long-term investors very much remain intact. And the fac*t we can be on a call and remark on visibility to a much improved environment for the back half of '08 and reasons to share optimism about '09 and really know that SB will delivered and impacting our 2010.*

*None of those things have changes and so the day-to-day changes in the overall valuation of the Company don't always make sense in terms of really reflecting what is, I think, people that are close to our efforts, the underlying strategies.* [emphasis added]

58.    The market's response to the news of April 17, 2008 was overwhelmingly negative.  IGT stock declined almost 6.5% to $35.70 from the prior day's closing price of $38.01.

59.    On June 26, 2008, Morgan Stanley downgraded IGT to "equal-weight" from "overweight," saying the company may find it tough to regain market share in the United States due to strong competition.  The brokerage cut IGT's near- and long-term U.S. market share estimates to 40 percent from 46 percent, but it said strong execution of server-based gaming could help the company recover from these challenges.  The brokerage also lowered its 2008

24

1     estimates on Reno, Nevada-based company by 7 cents to $1.33 a share and made deeper cuts in

2     its 2009 estimates to $1.51 from $1.76 a share. Shares of IGT were down 3 percent at $26.50 in

3     trading before the bell and closed at $27.31.

4         60.      Defendants, however, knew or should have known that IGT's SB was behind

5     schedule and would not be strongly executed and that the Fund was artificially inflated.

6         61.      On July 17, 2008, the Company issued a press release entitled "International

7     Game Technology Reports Third Quarter Fiscal Year 2008 Results" in which it stated in relevant

8     part that

> 9     International Game Technology (NYSE: IGT) announced today
>
> 10     operating results for the third quarter ended June 30, 2008. Net
>
> 11     income for the quarter was $108.3 million or $0.35 per diluted
>
> 12     share versus $136.4 million or $0.41 per diluted share in the same
>
> 13     quarter last year. For the nine-month period ended June 30, 2008,
>
> 14     net income was $290.5 million or $0.92 per diluted share
>
> 15     compared to $385.6 million or $1.14 per diluted share in the same
>
> 16     period last year. Comparability for the year-to-date periods is
>
> 17     affected by a number of significant items. A supplemental schedule
>
> 18     of these items is included at the end of this release.
>
> 19     "Although the market environment continues to be impacted by
>
> 20     unfavorable economic conditions, IGT delivered strong revenues
>
> 21     and gross profits during the third quarter," said Chairman and CEO
>
> 22     TJ Matthews. "We furthered our server-based gaming initiatives
>
> 23     with the release of several new models on our Advanced Video
>
> 24     Platform (AVP®) and the completion of the strategic acquisition
>
> 25     of Million-2-1 in the third quarter, as well as closing the
>
> 26     acquisition of substantially all of the assets of Cyberview
>
> 27     Technology, Inc. in July. In addition, we have repurchased 14.6
>
> 28     million shares of IGT stock since April 18, 2008."

* * *

For the nine-month period ended June 30, 2008, worldwide product sales generated gross profit of $479.4 million versus $496.9 million in the prior year due to a reduction in machine sales partially offset by growth in non-machine revenues. Non-machine revenues improved to $301.8 million or 34% of total product sales year-to-date compared to $266.1 million or 28% of total product sales in the prior year.

* * *

Working capital increased to $779.0 million at June 30, 2008 compared to $595.5 million at September 30, 2007. Cash equivalents and short-term investments (inclusive of restricted amounts) totaled $382.1 million at June 30, 2008 versus $400.7 million at September 30, 2007. Debt totaled $2.0 billion at June 30, 2008 compared to $1.5 billion at September 30, 2007. The available capacity on our $2.5 billion line of credit totaled $1.4 billion as of June 30, 2008.

62.     Company executives Cavanaugh, Defendant Matthews and Siciliano again conducted an earnings conference call in which they affirmed the Company's results and that SB continued to make good progress and Cavanaugh disclosed that "[p]art of this quarter's lower level of replacement demand was an internal decision based on manufacturing capacity, and a prioritization of new or expansion units being put in the queue ahead of replacements, so we hope that in Q4 we would see an uptick in replacement demand." Also during the call, Defendant Matthews acknowledged that the Company had been forced to reduce spending in other areas because of rising development costs. Defendant Matthews then addressed earnings guidance, stating:

So that brings us to the topic of guidance, and the fact is that the conditions that we see in the marketplace are looking like they will

1   continue for the foreseeable future. They are unprecedented. *We*
2   *have never really seen gaming play levels fall across all markets*
3   *as we have in the first half of this year. If that continues, that will*
4   *probably weigh a little bit on our game ops business, and is*
5   *probably also going to affect some amount of casino spend*
6   *activity*, whether it relates to CapEx or OpEx. So we at least need
7   to be making sure that we are paying attention to whether or not
8   there is any change of behavior in that regard. And so while we
9   were able to return to our prior trend levels after that difficult
10  second quarter that we reported, we really don't expect we will
11  immediately build upon these results until the market conditions
12  improve.

13  So the result, I think our *guidance for the next three quarters needs*
14  *to be in a range of $0.30 to $0.35.* This range is not going to
15  contemplate any efficiency measures we are able to implement
16  over the period, and it is likely that we will revisit our guidance on
17  future earnings calls if visibility of the future marketplace
18  conditions improves. And *as I said, in the back half of 2009, we*
19  *know that new expansion unit demand should make those results*
20  *the kind of results that we can have maybe a slight improvement in*
21  *the guidance that we are giving here....* So I want to thank you for
22  your interest in IGT, and I want to open the line for questions.
23  [emphasis added]

24  63.   In addressing the Company's SB product, Defendant Matthews recognized that:
25  It is unfortunate that SB - the problem with the SB story, and I
26  think probably some of the frustration with investors is that we
27  have just been talking about it too long. *We've been talking about*
28  *it now since April of 2005, and it is still November 2009 before you*

1  *see this big meaningful first deployment*, even though I think you

2  start seeing a fair amount of commitments now with more

3  successful field trials over the next six to eight months, but it really

4  belies the fact that the rest of our systems business is really in good

5  shape, is generating really good revenues, that we really are a

6  market leader in development there. I think we are stabilizing our

7  customer base. *We let some of our competitors catch up a little bit*

8  *with functionality* that we, of course, believe infringes our patent

9  portfolio, but even so, just *with the elapse of time have allowed*

10  *them to catch up a little bit.* But I think we quickly move --

11  separate ourselves from the field again with the developments that

12  we anticipate over the next 12 months. [emphasis added]

13      64.  In response to the news, of lower than expected guidance, Citigroup downgraded

14  the shares to hold from buy and removed the stock from their Top Picks Live List. The firm

15  lowered their target to $25 from $45.  Oppenheimer also downgraded the shares to Perform from

16  Outperform.

17      65.  Market reaction to the Company's announcement was overwhelmingly negative.

18  The Company's stock price fell over 8% on the next two days, to close at $22.77/share on July

19  17, 2009, down $1.89 from the previous day's closing price.

20      66.  On July 29, 2008 Wachovia downgraded IGT to Market Perform from

21  Outperform following channel checks which have increased the firm's concerns regarding future

22  EPS growth as operators are taking participating games off the floor and they also see delays and

23  cancellations of future casino projects.  "For International Games Technology, it will need to

24  drive a server based replacement cycle to grow EPS meaningfully, beginning in 2010," the

25  brokerage firm said. Before the advent of a server based gaming, Wachovia also expected delays

26  and cancellations of IGT's future casino projects which were to help its earnings.

27      67.  By September 3, 2008, there were rumors in the press that IGT's COO would

28  resign.  On September 7, 2008, in an article entitled "Signs of trouble from slot giant" the *Las*

*Vegas Review-Journal (Nevada)* reported on the true depth of the Company's problems, writing that:

> Twelve months ago, Wall Street analysts never imagined having concerns about International Game Technology. The Reno-based company, which has a large corporate presence in Las Vegas, controls the lion's share of the worldwide slot machine market.
>
> IGT has been an analysts' darling among manufacturers. Its stock price was stable and reviewers heaped praise over its products. Despite a casino industry slowdown in the slot machine replacement market, IGT still reported profits. Analysts remained bullish.
>
> *What a difference a year makes.*
>
> *Last week's resignation by IGT Chief Operating Officer Steve Morro may have signaled the start of a companywide shake-up. Gaming sources told of layoff rumors, which IGT spokesman Ed Rogich vigorously denied.*
>
> *IGT CEO TJ Matthews has said the company is in a restructuring mode. Rogich said all areas will be looked at to reduce expenses.*
>
> Matthews, considered one of the industry's brightest executives, is feeling some heat. He will add Morro's COO duties when the resignation is complete. But Matthews is also chairman and president as well as CEO, leaving some analysts worried that *management is spread too thin.*
>
> Wall Street expressed concern last week that *Morro's exit was symptomatic of IGT's fortunes. The stock price is down almost 60 percent from a 52-week high of $49.41 on Feb. 26.*
>
> *"IGT's fundamentals, market share position, new device platform, game theme and system development progress are not likely to*

1    *improve in the near term, and may have worsened since the*

2    *company last communicated with investors,*" Merrill Lynch

3    gaming analyst Rachael Rothman wrote.

4    UBS Securities analyst Robin Farley didn't think IGT's strategic

5    examination would help increase earnings until the second half of

6    2009.

7    "This review will ultimately include a cost-cutting component,"

8    Farley said, adding that the current focus is on management

9    structure. [emphasis added]

10    68.    In a follow-up article entitled "Competitors, downturn dog slots leader;

11    Ailing IGT needs to do something; 'relatively drastic,' analyst says" September 8, 2008the *Las*

12    *Vegas Review-Journal (Nevada)* reported that:

13    If the slot machine business were like the film industry, the biggest

14    studio with the greatest collective experience and longest string of

15    blockbusters would be International Game Technology.

16    Besides offering a slew of competitive games and popular brand

17    names, the world's largest slot maker long benefitted from

18    competitors, who, like a group of independent filmmakers, didn't

19    equal the volume or variety of IGT's products.

20    That has changed. Smaller companies, including Bally

21    Technologies, WMS Gaming and Aristocrat Technologies, are

22    catching up at IGT's expense.

23    Bally, which specialized in spinning-reel machines, branched out

24    into video slots that allow dozens of paylines instead of the

25    traditional, single payline across the middle. WMS, among the first

26    to sell multi-line video slots, developed traditional-looking slots

27    with three spinning wheels. Aristocrat, which lacked machines that

28

1   accept and dispense paper tickets instead of coins, eventually had a

2   slew of products that made inroads on IGT-dominant casino floors.

3   *The economic downturn has exacerbated IGT's problems by*

4   *putting a dent in the market for new slot machines and upgrades.*

5   IGT, based in Reno, still has a size advantage over its competition.

6   Unlike the movie industry, where skillful directors, actors and

7   writers can give a film a good shot at success, the slot business is a

8   scattershot process of trial and error. Slot makers often have little

9   way of knowing whether their products will be a hit until the

10   machines are on the casino floor. Even big names with pricey

11   licensing deals behind them, such as Elvis and Drew Carey, can

12   fizzle with gamblers.

13   As a result, companies develop hundreds of slots each year. As

14   with movie sequels, titles that have worked in the past get new

15   bells and whistles.

16   But few withstand the test of time. Casinos are constantly trying

17   new games to lure customers back to their properties. Those that

18   don't get enough play get the boot.

19   That makes IGT, which sells a majority of the slots in new casinos

20   but is less successful at selling replacement machines, a victim of

21   its own success. But IGT also needs to sell replacements to

22   succeed, and the casinos that bought the 510,000 or so machines

23   now populating casino floors may see little need to replace them

24   during the current downturn.

25   *Casinos also have been slow to adopt so-called server-based slots.*

26   *IGT has spent millions developing the technology, which, together*

27   *with similar systems from other companies, is expected to*

28   *revolutionize casino floors by providing huge libraries of games on*

*demand. It will take many years for IGT, which has outspent its competitors on this front, to see a return on that investment.*

Meanwhile, gamblers are dropping less into slots, making casino operators reluctant to shell out money for new technology.

*In the company's third fiscal quarter, which ended June 30, revenue declined 6 percent and profit fell 21 percent compared with the same period a year earlier while expenses rose.* Profit from the sale of machines was flat. Operational expenses were 30 percent of revenue during the quarter compared with 26 percent a year ago.

As part of a companywide restructuring, IGT's chief operating officer, Steve Morro, is resigning, effective Sept. 27.

*After missing several earnings targets, IGT's stock hit a new low of about $20 per share last week and is down 50 percent from a year ago. Wall Street, impatient for results, is expecting layoffs.*

The company's labor costs relative to the amount of revenue it is generating are too high, Deutsche Bank stock analyst Bill Lerner said. "They need to do some things that are relatively drastic."

IGT Vice President of Marketing Ed Rogich said the company views layoffs as a ***last resort*** and is exploring other cost-reduction strategies first, such as early retirement packages. [emphasis added]

69.     Less than two weeks after stating that lay-offs were a "last resort" on September 17, 2007, the *Las Vegas Review-Journal (Nevada)* reported in an article entitled "IGT to impose layoffs" that:

Slot machine giant International Game Technology said Tuesday it will lay off a yet-to-be determined number of employees by Jan. 5 due to the troubled economy.

In an e-mail to employees, IGT Chairman and Chief Executive Officer TJ Matthews said the number of layoffs will be based on how many workers accept a voluntary separation program that was introduced last week. IGT spokesman Ed Rogich said roughly 500 employees, age 55 and over, were offered buyouts.

"As we continue efforts to reduce expenses and restructure the company to maximize efficiencies in light of a strained economic environment, *it has become evident that we must conduct an involuntary reduction in our work force in addition to our other efforts*," Matthews said in the e-mail.

IGT employs roughly 5,400 workers worldwide, including 3,000 employees at its corporate headquarters in Reno. At the company's secondary headquarters in Las Vegas, IGT employs about 1,000 workers.

IGT, the gaming industry's leading slot machine manufacturer, has hit rough times this year. Profits are weaker than they were a year ago, the company's chief operating officer resigned earlier this month, and IGT's stock price is down more than 60 percent from its 52-week high of $49.41 on Feb. 26. Shares of the company closed Tuesday at $18.81 on the New York Stock Exchange, up 2 cents, or 0.11 percent.

Rogich said IGT is going through a strategic review of all divisions to see where cuts can be made. The first step is to gauge response to the buyout program.

"Part of the process is to make people aware of our intentions that there may be further cuts," Rogich said. "We're trying to be up-front with employees and give them all the information they will need."

1    Macquarie Capital gaming analyst Joel Simkins said he was not
2    surprised by news of the impending layoffs. He said the slot
3    machine maker has about 1,200 workers in engineering, an area he
4    said could be reduced.

5    IGT has also spent millions on server-based gaming, which may
6    not be introduced to casinos as quickly as hoped. IGT spent $76
7    million in June to acquire a European slot machine rival as part of
8    its server-based gaming efforts.

9    "The company needs to get leaner," Simkins said. "There are a lot
10   of incremental expenses that can be cut."

11   Matthews told IGT workers the company was not closing its Reno
12   headquarters nor are the layoffs focused in one department. A
13   decision regarding the layoffs is expected to be made by November
14   with the jobs being eliminated in January.

15   "My hope is that through these efforts, we can stabilize our
16   spending to be aligned with our revenue forecasts and be in a
17   position to weather the near-term uncertainty that is prevalent in
18   our industry and our economy in general," Matthews said.

19   70.   On September 17, the Company's shares fell 6% to $17.70 per share.

20   71.   The Company's problems were further highlighted in an article entitled "Too
21   little, too late for sinking slot maker?" published in the *Las Vegas Review-Journal (Nevada)* on
22   September 22, 2008. The article stated, in part,

23   It was late September 2003 when slot machine giant International
24   Game Technology graced the cover of the New York Times
25   Magazine. The lengthy Sunday profile touted the company's
26   success in placing a vast collection of games based on once-
27   popular television shows and celebrities inside casinos.

28                               * * *

Casinos cleared room on their floors for thousands of the machines. IGT's stock price skyrocketed, revenues flowed and profits soared.

Somehow, in the past year, IGT has lost its way. The slot maker has been hobbled by the slumping economic conditions that have beleaguered the gaming industry.

Since February, shares of IGT have lost more than 60 percent of their value on the New York Stock Exchange. During the same period, analysts said the company has lost market share to slot machine rivals Bally Technologies and WMS Industries.

IGT is now making changes to reduce expenses and reverse the trend.

Last week, news leaked that Reno-based IGT could reduce its 5,400-person work force anywhere from 9 percent to 18 percent. Many on Wall Street believe IGT should refocus its efforts on game content that will help casinos attract customers.

"While we are pleased that IGT is starting to take the right steps to right size its cost structure in light of the current environment, *it may not be enough to offset a top line slowdown*," Macquarie Capital gaming analyst Joel Simkins told investors a day after IGT informed employees through an e-mail that it would be reducing staff by Jan. 5.

Simkins, who has been critical of IGT recently, said the company needs to scale back its efforts to develop a server-based gaming system and return to its core slot machine business in order to sell more games. He said the company's video slot machines are not as popular as games being developed by other slot makers.

1    "IGT appears to be focusing on developing more innovative
2    content to offset market share losses," Simkins said. "We are
3    concerned that it could be on the verge of permanent displacement
4    of share to its key rivals."
5    IGT Chairman and Chief Executive Officer TJ Matthews told
6    employees in his e-mail that layoffs were part of a companywide
7    restructuring. Although it was unclear how many positions would
8    be lost, some analysts speculated that IGT could cut anywhere
9    from 500 to 1,000 positions, including many spots in the
10   company's engineering division.
11   *Deutsche Bank gaming analyst Bill Lerner said IGT should have*
12   *taken cost-cutting steps a year ago when the fortunes of slot*
13   *makers began to sag.* Casinos are not changing out older slot
14   machines at the same rate that games were being replaced earlier in
15   the decade.
16   "Layoffs, while as unfortunate as they may be at this time, make a
17   lot of sense for this company," Lerner said. "During this tough
18   economic environment, IGT needs to decide what is the right size
19   this company needs to operate."
20   Stifel Nicolaus gaming analyst Steven Wieczynski said the layoffs
21   shouldn't come as a surprise to IGT investors and could be
22   considered welcome news.
23   "IGT's cost-cutting program will position the company in a better
24   state so once the domestic slot market turns, revenues should flow
25   to the bottom line at a quicker pace," Wieczynski said in a note to
26   investors.
27   In his e-mail, Matthews told employees the number of layoffs will
28   be determined by how many employees accept a recently offered

buyout program. IGT spokesman Ed Rogich said all company divisions are being reviewed.

*Analysts said IGT needs to reduce costs because revenues have declined. For the first nine months of fiscal 2008, IGT's selling, general and administrative expenses are 18 percent of the company's revenues, which are almost $1.9 billion, down 5 percent from 2007.*

During 2003 and 2004, IGT's revenues soared as casinos replaced older slot machines with games featuring ticket in-ticket out cashless technology. Those same costs on the IGT balance sheet were between 12 percent and 13 percent of revenues.

"That's the figure the company needs to bring down," Lerner said.

"That's why the layoffs are happening."

72.     On September 17, the Company's shares fell 5.5% to $17.38 per share.

73.     On October 13, 2008, IGT was downgraded to "Sell" from "Hold" at Argus on news that some casino operators have replaced many "participation" games, which gave IGT a share of the winnings, with fully owned slot machines in an effort to boost revenues.

74.     On October 16, 2008, a Nevada court found three of International Game's patents, including two "wheel" patents and a touch-screen player tracking patent, invalid. It also ruled that Bally Technologies' iView units do not infringe on International Game's patents.

75.     On October 30, 2008, IGT announced its results for the fourth quarter in a press release entitled "International Game Technology Reports Fourth Quarter and Fiscal Year 2008 Results." The press release stated, in relevant part, that:

International Game Technology (NYSE: IGT) announced today operating results for the fourth quarter and fiscal year ended September 30, 2008. Net income for the quarter was $52.1 million or $0.18 per diluted share, inclusive of a non-cash charge of $28.6 million or $0.10 per diluted share from write-downs of certain

investments, versus $122.6 million or $0.38 per diluted share in the same quarter last year. For the fiscal year, net income was $342.5 million or $1.10 per diluted share compared to $508.2 million or $1.51 per diluted share in the same period last year. Comparability for the quarter and fiscal year periods is affected by a number of items. A supplemental schedule of these items is included at the end of this release.

"Our fiscal 2008 results reflect challenging economic operating conditions affecting our customers and in turn our business," said Chairman and CEO TJ Matthews. "Despite these challenges, we remained focused on key business initiatives. During 2008, IGT released several new models on our Advanced Video Platform (AVP(R)) and released close to 700 game titles worldwide across all platforms. We made significant progress in the development of our server-based gaming initiatives and will begin commercially deploying initial versions of this technology in 2009."

* * *

For the fiscal year ended September 30, 2008, IGT generated $516.3 million in cash from operations on net income of $342.5 million compared to $821.5 million on net income of $508.2 million in the prior year period. Reductions in year-over-year cash from operations were primarily the result of lower earnings, increased inventory, additional prepayments to secure long-term licensing rights and increases in accounts receivable.

76.   Company executives Cavanaugh and Defendant Matthews again conducted an earnings conference call in which they stated that the Company would make strategic changes to increase productivity and responsiveness to customer and marketplace needs and advised that

1  until headwinds subside somewhat, EPS will likely be at lower end or slightly below previous

2  guidance of $0.30-0.35.  Defendant Matthews further stated that

3      on expense reduction [] we wanted to make sure that we did it

4      right, that we've spent about $700 million in operating expenses in

5      the course of 2007, got ourselves to a run rate of $800 million or so

6      by the end of this fiscal year 2008, and it was too much. Obviously

7      it was done in anticipation of revenue growth that has been

8      deferred, and so we need to reinvestigate costs. Much of that cost

9      reduction is a reduction in staffing, and we wanted to make sure

10     that we did it really with the idea that it was gentle as possible with

11     our employees, that much of this situation is management created,

12     and not necessarily the result of not every individual at IGT

13     working very hard, and so offering first an early retirement

14     program, and then following that with kind of the involuntary

15     separations, was our plan. All of that is going to be accomplished

16     by the middle of November, and that will manifest itself in much

17     of the cost reduction. But the cost review doesn't stop there.

18     I mean, really, we are looking at every expense and refocusing IGT

19     on the idea that expenses matter. So it's cost of goods, it's SG&A,

20     it's R&D, it's other expenses, it's taxes. Five big categories for us

21     to have focus on, making sure that whether it's access to capital, or

22     it's better planning from a tax perspective. It's making sure that

23     our R&D priorities are correct, that the SG&A staffing supports

24     the current level of business, that our cost of goods demonstrates

25     efficiencies wherever possible. All of that is being focused. And so

26     I really expect that we will exceed that run rate as the course of the

27     year progresses, and that $175 million a quarter or less still is the

28     goal in total operating expenses. And so it may seem like it's

taking a little while, but maybe it just took us a little while to say that we were committed to it, which we did last call, and I think got on it pretty quickly here with kind of this final action in November. As it relates to where we are in game ops install base, the casino install base was stable throughout the year. I mean, we ended the year at roughly the same number of units as we began the year. And that reflects the fact that some operators are, at any given time, removing units and in other instances, operators are increasing the number of units. And the ones that are removing units get lots of attention, and the ones that are adding units don't.

77.   Defendant Matthews further noted that:

content [] seems to take a back seat, because this company is built around games. It's focus is games, and every show I think has that at its core, but because of the idea of how games are going to be delivered and how the customer experience is going to be expanded due to network implementation, that that seems to kind of be in the background now. This show where we've launched AVP, and we launched MLD, you will see a much greater impact from our game development than maybe you noticed in recent shows. SB being deployed on a smaller footprint in the casino environment is all about how to help the performance of 25 to 100 games through expanded offering on the game side of the equation. And so even the SB offering, the strategy, will have a much greater games focus than it has in times past. So I think content will be the star of the show this year.

78.   On October 30th, the Company's shares fell 4% to $12.01 per share.

79.   On October 31, 2008, thestreet.com reported in downgrading the Company's stock that:

40

We've downgraded International Game Technology (IGT:NYSE), which engages in the design, manufacture, and marketing of computerized gaming equipment, network systems, and services in North America and internationally, from hold to sell, based on its deteriorating net income, generally weak debt management, weak operating cash flow, generally disappointing historical performance in the stock itself and feeble growth in its earnings per share.

Net income decreased by 57.6% when compared with the same quarter one year ago, falling from $122.60 million to $52.00 million and underperforming the S&P 500 and the hotels, restaurant and leisure industry. The debt-to-equity ratio is very high at 2.49 and currently higher than the industry average, implying very poor management of debt levels within the company. IGT's quick ratio is somewhat strong at 1.32, demonstrating the ability to handle short-term liquidity needs. Net operating cash flow has decreased to $155.60 million, or 39.36% when compared with the same quarter last year. Despite a decrease in cash flow, IGT is still fairing well by exceeding its industry average cash flow growth rate of -80.54%.

IGT has experienced a steep decline in earnings per share in the most recent quarter in comparison with its performance from the same quarter a year ago. The company has reported a trend of declining earnings per share over the past two years. However, the consensus estimate suggests that this trend should reverse in the coming year. During the past fiscal year, IGT lower earnings of $1.11 versus $1.52 in the prior year. This year, the market expects an improvement in earnings to $1.24.

1    Shares have tumbled by 72.40% on the year, worse than the S&P
2    500's performance. Consistent with the plunge in the stock price,
3    the company's earnings per share are down 52.63% compared with
4    the year-earlier quarter. Naturally, the overall market trend is
5    bound to be a significant facto, and in one sense, the stock's sharp
6    decline last year is a positive for future investors, making it
7    cheaper (in proportion to its earnings over the past year) than most
8    other stocks in its industry. But due to other concerns, we feel the
9    stock is still not a good buy right now.

10    80.    The Company's problems persisted.  In a January 22, 2009 press release entitled
11   "International Game Technology Reports 2009 First Quarter Results" the company stated in
12   relevant part that:

13    Net income for the quarter was $65.7 million or $0.22 per diluted
14    share compared to $113.7 million or $0.36 per diluted share in the
15    same quarter last year. Comparability for the quarter was
16    unfavorably impacted by a number of significant items that total
17    $20.4 million, after tax, or $0.07 per diluted share. A supplemental
18    schedule of these items is included at the end of this release.

19    Comparability was also affected by an extra week in the current
20    quarter due to the Company's 52/53-week fiscal year, where fiscal
21    2009 will contain 53 weeks versus the normal 52 weeks in fiscal
22    2008. As a result, the current year quarter was 14 weeks in length
23    compared to 13 weeks in the prior year quarter.

24    "Our first quarter results reflect the on-going effects of difficult
25    economic conditions worldwide that have impacted both gaming
26    operators and casino patrons.  Although we expect to continue to
27    face a challenging global market environment in the near-term, we
28    remain focused on IGT's long term objectives.  During the quarter

we filled key strategic roles, implemented cost rationalization
initiatives and completed the upgrade of our entire line of machine
products headlined by our innovative Multi- Layer Display®
(MLD®) technology and REELdepth™ games," said Chairman
and CEO TJ Matthews.

81.    As a result of its troubles, on March 3, 2008 the Company slashed its dividend from fourteen and one-half cents to six cents per share in order to preserve cash. "In the current environment, we believe a revised dividend is the most prudent decision and in the best interest of IGT and our stakeholders," Defendant Matthews said.

82.    As a further result of the Company's troubles, on March 9, 2009 Goldman Sachs downgraded IGT to Neutral from Buy with a target reduced to $9 from $15. Goldman's survey indicated that the Company continued to lose market share. Goldman recognized that the Company would face a material refinancing risk and noted that it would take time to turn the Company around. A Goldman survey indicated that slot managers would give only 37 percent of floor share to IGT, well below its current 52 percent share. International Game, which makes slot machines and casino management systems, is also saddled with a $2.5 billion credit agreement that matures in 2010 and needs to pay off about $786 million due at year's end.

83.    On March 9, 2009 the stock closed at $7.12, down $0.35 (-4.3%) on heavy volume.

84.    IGT, which opened the Class Period at trading at $42.75 per share, as a result of the problems described above closed at approximately $7.12 per share (a decrease of over 83%), thereby greatly diminishing the retirement benefits of Plaintiffs and the other Plan participants.

**MISMANAGEMENT OF PLAN ASSETS**

85.    Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), at all times relevant to this Complaint, Defendants had a duty to discharge their duties with respect to the Plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise

of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

86.     Defendants are not entitled to the protections of ERISA § 404(c), 29 U.S.C. § 1104(c), because the Participants did not exercise independent control over their accounts, because Defendants subjected them to improper influence with respect to the Plan's investments in IGT common stock, and because Defendants concealed material non-public information concerning IGT that they were not precluded from disclosing under applicable law.

87.     Defendants breached their fiduciary duties in that they should have known the facts alleged above and should have known that the Plan should not have invested in IGT common stock during the Class Period.

## FIRST CLAIM: IMPRUDENT INVESTMENT IN IGT COMMON STOCK
## (AGAINST ALL DEFENDANTS)

88.     Plaintiffs reallege and incorporates herein by reference the allegations set forth above.

89.     Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

90.     Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants. Defendants' selection, monitoring, and continuation of the investment alternatives under the Plan were subject to the above-described fiduciary duties. By their continuing to offer IGT common stock as an investment under the Plan, when IGT's true adverse financial and operating condition was being concealed, Defendants breached each of these fiduciary duties.

91.     In particular, IGT was an imprudent retirement investment for the Plan during the Class Period because of, inter alia, the facts that:

a. The Company's research and development funding materially compromised its growth prospects and caused the Company lost market share to rivals;

b. The Company's research and development funding and loss of market share made Company growth statements overly optimistic;

c. Increasing costs and economic troubles made the company's time frame for marketing its server-based technology ("SB") and its "advanced video gaming platform ("AVP") impossible;

d. The Company minimized the impact of a slowdown in the gaming industry which undermined the Company's shift to SB and AVP;

e. The Company failed to reduce expenses to meet a slowdown in the gaming industry;

f. as a result of the above, the Company's actual and projected results for the Class Period were grossly inflated;

g. the Company lacked the required internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts;

h. By the time that the Company reacted to the above, there was concern that the Company may not be able to do enough to offset a top line slowdown;

i. The Company faced a material debt refinancing risk; and

j. the Company lacked the necessary personnel to issue accurate financial reports and projections.

92. As a consequence of Defendants' breaches, the Plan suffered losses.

93. Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

94. Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

## SECOND CLAIM: MISREPRESENTATION

## (AGAINST ALL DEFENDANTS)

95. Plaintiffs reallege and incorporates herein by reference the allegations set forth above.

96. Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

97. Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

98. Defendants breached these fiduciaries in that they made material misrepresentations and nondisclosures as alleged above.

99. In particular, the Plan's fiduciary communications (such as SPDs) and SEC filings during the Class Period, including its proxy statements and SEC filings on Forms 10-Q and 10-K which were incorporated into the SPDs, were materially false and misleading in that they misrepresented the truth about the Company, and misleadingly concealed material adverse information, including, *inter alia*, the facts that:

a. The Company's research and development funding materially compromised its growth prospects and caused the Company lost market share to rivals;

b. The Company's research and development funding and loss of market share made Company growth statements overly optimistic;

c. Increasing costs and economic troubles made the company's time frame for marketing its server-based technology ("SB") and its "advanced video gaming platform ("AVP") impossible;

d. The Company minimized the impact of a slowdown in the gaming industry which undermined the Company's shift to SB and AVP;

1            e.      The Company failed to reduce expenses to meet a slowdown in the

2 gaming industry;

3            f.      as a result of the above, the Company's actual and projected results for the

4 Class Period were grossly inflated;

5            g.      the Company lacked the required internal controls, and, as a result, the

6 Company's projections and reported results were based upon defective assumptions and/or

7 manipulated facts;

8            h.      By the time that the Company reacted to the above, there was concern that

9 the Company may not be able to do enough to offset a top line slowdown;

10            i.      The Company faced a material debt refinancing risk; and

11            j.      the Company lacked the necessary personnel to issue accurate financial

12 reports and projections.

13       100.      The Participants relied upon, and are presumed to have relied upon, Defendants'

14 material misrepresentations to their detriment.

15       101.      As a consequence of Defendants' material misrepresentations, the Plan suffered

16 losses.

17       102.      Defendants are individually liable to make good to the Plan any losses to the Plan

18 resulting from each breach.

19       103.      Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also

20 award appropriate equitable relief, including in the form of restitution.

21                 **THIRD CLAIM: NONDISCLOSURE/OMISSION**

22                     **<u>(AGAINST ALL DEFENDANTS)</u>**

23       104.      Plaintiffs reallege and incorporates herein by reference the allegations set forth

24 above.

25       105.      Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any

26 of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable

27 to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to

28 such other equitable and remedial relief as the court may deem appropriate.

106.     Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

107.     Defendants breached these fiduciaries in that they made nondisclosures as alleged above.

108.     In particular, each and every fiduciary communication (including but not limited to SPDs, newsletters, account statements) during the Class Period omitted material, relevant data which were necessary for Plan participants to understand the true risk/return characteristics of an investment Company stock, including, *inter alia*, the facts that:

a.     The Company's research and development funding materially compromised its growth prospects and caused the Company lost market share to rivals;

b.     The Company's research and development funding and loss of market share made Company growth statements overly optimistic;

c.     Increasing costs and economic troubles made the company's time frame for marketing its server-based technology ("SB") and its "advanced video gaming platform ("AVP") impossible;

d.     The Company minimized the impact of a slowdown in the gaming industry which undermined the Company's shift to SB and AVP;

e.     The Company failed to reduce expenses to meet a slowdown in the gaming industry;

f.     as a result of the above, the Company's actual and projected results for the Class Period were grossly inflated;

g.     the Company lacked the required internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts;

h.     By the time that the Company reacted to the above, there was concern that the Company may not be able to do enough to offset a top line slowdown;

i.     The Company faced a material debt refinancing risk; and

j.    the Company lacked the necessary personnel to issue accurate financial reports and projections.

109.    The Participants relied upon, and are presumed to have relied upon, Defendants' omissions to their detriment.

110.    As a consequence of Defendants' omissions the Plan suffered losses.

111.    Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

112.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

**FOURTH CLAIM: DIVIDED LOYALTY**

**(AGAINST THE INDIVIDUAL DEFENDANTS ONLY)**

113.    Plaintiffs reallege and incorporates herein by reference the allegations set forth above.

114.    Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

115.    Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

116.    Defendants breached their fiduciary obligations when they acted in their own interests rather than solely in the interests of the Participants and Beneficiaries.

117.    As a consequence of these breaches, the Plan suffered losses.

118.    Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

119.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

**FIFTH CLAIM:  BREACH OF THE DUTY TO PROPERLY APPOINT, MONITOR**

**AND INFORM THE COMMITTEE AND MEMBERS OF THE COMMITTEE**

**(AGAINST THE DIRECTOR DEFENDANTS ONLY)**

120.    Plaintiffs reallege and incorporates herein by reference the allegations set forth above.

121.    The Director Defendants had the duty and responsibility to properly appoint, monitor and inform the members of the Committee and/or other persons who exercised day-to-day responsibility for the management and administration of the Plan and their assets.

122.    The Director Defendants failed to properly appoint, monitor and inform such persons in that the Director Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the Director Defendants did adequately inform such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by IGT during the Class Period identified herein) but nonetheless continued to allow such persons to offer IGT common stock as an investment option under the Plan even though the market price of IGT common stock was artificially inflated and even though IGT common stock was not a prudent investment for Participants' retirement accounts under the Plan.

123.    As a consequence of these breaches, the Plan suffered losses.

124.    The Director Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

125.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

A.    Actual damages in the amount of any losses the Plan suffered, with such losses to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

B.    Appropriate equitable relief, including in the form of restitution;

C.    Costs pursuant to 29 U.S.C. § 1132(g);

D.    Attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and,

E.    Such other relief as the Court may deem equitable and just.

### JURY TRIAL DEMAND

Plaintiffs demands trial by jury of all issues to triable.

Dated:  This 2ⁿᵈ day of October __, 2009

WHITE  &  WETHERALL, LLP

Geoffrey White, Esq.
3185 Lakeside Drive
Reno, Nevada  89509
Phone:  (775) 828-9999
Fax:  (775) 828-9998
*Attorneys for Plaintiffs*

And

Patrice L. Bishop, Esq.
STULL, STULL & BRODY
10940 Wilshire Boulevard
Suite 2300
Los Angeles, CA  90024
Phone: (310) 209-2468
Fax:     (310) 209-2087

Michael J. Klein, Esq.
STULL, STULL & BRODY
6 East 45th Street
New York, New York 10017
Phone: (212) 687-7230
Fax: (212) 490-2022

*Attorneys for Plaintiffs*
*(Pro Hac Vice Pending)*